IRVING, J„
for the Court:
¶ 1. Following a bench trial, Clinton Wyatt Nolan was convicted of heat-of-passion manslaughter in the DeSoto County Circuit Court. He was sentenced to seven years in the custody of the Mississippi Department of Corrections and to thirteen years of post-release supervision, with five reporting and eight non-reporting. Aggrieved, Nolan appeals and asserts (1) that the circuit court erred in refusing to grant his motion for a directed verdict,[1] (2) that the verdict is against the overwhelming weight of the evidence, and (3) that the M’Naghten standard should be abandoned in Mississippi.[2]
¶ 2. We find that the evidence is insufficient to support Nolan’s conviction for heat-of-passion manslaughter. However, *914 we conclude that sufficient evidence exists to support a conviction for manslaughter pursuant to Mississippi’s catchall manslaughter provision, Mississippi Code Annotated section 97-3-47 (Rev.2006).[3] Therefore, we affirm Nolan’s conviction and sentence.
FACTS
¶ 3. During the early morning hours of May 26, 2006, Nolan called 911 after shooting his father, Donald Nolan, in the chest in Hernando, Mississippi. Donald died shortly thereafter.[4] In November 2006, Nolan was indicted by a grand jury for heat-of-passion manslaughter. Nolan waived his right to a jury trial. Thereafter, a bench trial was held on December 11, 2007, wherein Nolan asserted an insanity defense.
¶ 4. At the beginning of the trial, the State entered into evidence written stipulations of fact and rested its case, reserving the right to call rebuttal witnesses. Nolan made a motion for a directed verdict, which the circuit judge denied.
¶ 5. Following the denial of his motion for a directed verdict, Nolan called seven witnesses, the first of whom was Dr. Robert Hoehn. Dr. Hoehn, who had been Nolan’s psychiatrist since 1996, was qualified as an expert in the field of psychiatry. Dr. Hoehn testified that Nolan had been diagnosed with, and treated for, “Asperger’s disorder” prior to coming under his care and that he had treated Nolan for symptoms related to “anxiety, attention deficit, and depression.”[5] Dr. Hoehn stated that he had placed Nolan on several medications while Nolan was under his care. Dr. Hoehn testified that he had made modifications to Nolan’s medication during the month before the shooting and that it appeared that Nolan had adjusted well. However, Nolan became more depressed and anxious, prompting Dr. Hoehn to switch his medication from Paxil to Zoloft. Dr. Hoehn recalled that Nolan seemed to be doing better when he saw him approximately three weeks prior to the shooting. However, Dr. Hoehn stated that Nolan’s family members had contacted him the week of the shooting and had informed him that Nolan seemed more upset, was more irritated, and had not been sleeping well. Dr. Hoehn testified that he then prescribed Klonopin.[6] Nolan killed his father within twenty-four hours of taking the Klonopin.
¶ 6. Dr. Hoehn testified that he visited Nolan in the DeSoto County Jail on May 31, 2006, at which time Nolan was “very psychotic.”[7] Dr. Hoehn explained that he meant that Nolan was “unable to distinguish what was real and what wasn’t.” According to Dr. Hoehn, Nolan was confused and agitated. After the shooting, Dr. Hoehn diagnosed Nolan with depressive type schizoaffective disorder. He explained that schizoaffective disorder lies between bipolar disorder and schizophrenia. He also noted that hallucinations are a common symptom of schizoaffective disorder and that Nolan did not experience *915 any hallucinations before the shooting. However, he pointed out that Nolan experienced command hallucinations after the shooting. He defined a command hallucination as a voice that tells a person to do something. When asked whether he had an opinion as to whether Nolan understood the nature and quality of his actions at the time that he shot his father, Dr. Hoehn stated:
I think [Nolan] has always understood the facts of the case as it relates to that he shot his father. As far as, you know, what led to his making that decision, I think he was having very altered thinking. I don’t think he was — I think he was delusional and psychotic, and I think, you know, that he wasn’t in his right mind in terms of making decisions.
Dr. Hoehn concluded by saying that Nolan never expressed to him that he had had command hallucinations on the night of the shooting. Dr. Hoehn stated that he thought that Nolan “was starting to have the beginnings of a psychotic episode the week before his dad died.” Dr. Hoehn also stated that after the shooting, Nolan was prescribed Seroquel, an antipsychotic drug.
¶ 7. Nolan posted bond and was released from jail. Dr. Hoehn- explained that following Nolan’s release, Nolan was sent to Lakeside Behavioral Health System (Lakeside) in Memphis, Tennessee, for three months. According to Dr. Hoehn, Nolan showed improvement while at Lakeside. For example, Nolan’s hallucinations diminished, and although he showed some agitation and frustration, his mood became more stable.
¶ 8. Next, Nolan called Dr. Joseph C. Angelillo, an expert in the field of forensic psychiatry. Dr. Angelillo conducted an evaluation of Nolan a few weeks after the shooting to determine Nolan’s mental status at the time of the shooting. At the time that he conducted the interview, Nolan had been on Seroquel for two to three weeks and was “fairly lucid.” Dr. Angelil-lo concluded that Nolan did not understand the nature and quality of his actions on the night of the shooting.
¶ 9. Margaret Cashion, a nurse who worked at the DeSoto County Jail during Nolan’s incarceration, testified that while being housed in a holding cell on May 26, 2006, Nolan became aggressive and agitated. According to Cashion, she was called to render assistance after Nolan struck an officer on the nose. Cashion testified that when she reached Nolan’s cell, he was talking to a wall and that she was told that he had been hitting his head against the wall prior to her arrival. Cashion stated that Nolan was allowed to speak with his mother after complying with Cashion’s request to calm down. Cashion testified that she contacted Dr. Hoehn at some point thereafter and that he prescribed psychotropic medication which, in her opinion, positively affected Nolan’s behavior.
¶ 10. In addition, several friends of the Nolan family testified on Nolan’s behalf. Lynn Ford, who visited Nolan on a daily basis while he was incarcerated, recalled that during one visit Nolan asked her if she heard people talking, even though there was no one else in the room. Ron Donahoo visited Nolan while Nolan was at Lakeside and described Nolan as being agitated and frustrated about the circumstances surrounding why he was there.
¶ 11. J. Hickman testified about a telephone conversation that he had had with Donald shortly before the shooting. According to Hickman, Donald told him that Nolan’s condition had deteriorated, as Nolan had become agitated and was having trouble sleeping.
¶ 12. Like Ford, Hickman visited Nolan while Nolan was incarcerated. According *916 to Hickman, Nolan was incoherent, agitated, confused, and fidgety. Nevertheless, he noted that Nolan expressed remorse for his father’s death, even though he did not indicate that he knew what happened to his father.
¶ 13. James Wendell Sanders had lunch with Nolan and Donald on the day before the killing and testified that Nolan was withdrawn and “was not acting like his normal self.” Sanders noted that he had not seen Nolan in that state before.
¶ 14. The State then offered several rebuttal witnesses, including Commander Mark Blackson with the DeSoto County Sheriffs Department and clinical psychologist Dr. W. Criss Lott. Commander Black-son interviewed Nolan on the morning of the shooting and testified regarding the interview.[8] Commander Blackson testified that Nolan acknowledged shooting his father and that Nolan expressed remorse for doing so. Commander Blackson noted that the tape depicts an instance where the tape recorder was on and Nolan was talking, but stopped abruptly and asked whether the recorder was on. Commander Blackson answered affirmatively. Then, according to Commander Blackson, Nolan became quiet and ceased talking. Commander Blackson then turned the recorder off. Later, Commander Blackson turned the recorder on again, and Nolan just looked at it and remained silent. Commander Blackson then terminated the interview.
¶ 15. Dr. Lott, at the State’s request, interviewed Nolan one week before Nolan’s trial. Dr. Lott was charged with providing a psychological assessment and an evaluation of Nolan’s mental state at the time of the killing. Dr. Lott reviewed the following: (1) the transcript of Nolan’s interview conducted by Commander Black-son, (2) two psychological evaluations conducted in June 2006 by Drs. Angelillo and Robert Serino, (3) Dr. Hoehn’s medical records, and (4) Nolan’s medical records from Lakeside.[9] Dr. Lott opined that Nolan was mentally ill at the time of the shooting but that his mental illness did not impact his ability to understand the nature and quality of his actions. According to Dr. Lott, he reached this conclusion because Nolan is very familiar with guns and was able to tell the 911 operator that he had shot his father with a .357 handgun. Dr. Lott surmised that Nolan “obviously knew that this was a gun, and that indicates to me that [he knew] nature and quality.” Further, Dr. Lott testified that when Nolan spoke with Dr. Hoehn two days after the shooting, Nolan was clearly aware of what had transpired. Dr. Lott explained that, in his opinion, Nolan’s mental illness did not “preclude his knowing that this is a gun, and if I shoot at someone, I’m going to hurt someone.” Dr. Lott also testified that Dr. Hoehn failed to explain how Nolan did not know what would happen if he pointed the gun and fired it at his father.
¶ 16. In addition to his trial testimony, Dr. Lott sent a letter to the circuit court, wherein he wrote the following:
It is unclear to this examiner exactly what Mr. Nolan heard, as he gave inconsistent statements. He initially said that he could not recall what happened on the day of the offense, and did not spontaneously report hearing voices telling him to kill anyone, but his mother *917 encouraged [him] to recall what happened, and concurred that he heard voices telling him to kill his father. It should be noted that the mother reported that he had not told anyone in the family that he was hearing voices regarding his father calling him names or voices telling him to kill his father....
Asked to describe what he was thinking and feeling on the day of the alleged offense, he said, “I was worried that my brain wasn’t functioning right. I got up, don’t remember the time. My brain wasn’t functioning. I heard voices telling me that my father said I was a sociopath. Voices said I had to go kill him. I picked up my pistol I had under my bed for self-defense. I decided to pick up the gun and shoot him. I went upstairs and shot him. He woke up and told me to call 911 and I did. I was in a strange state when I shot him. I wasn’t sure what to do, confused. I told the police what happened and let them arrest me. They put my dad in the ambulance. In jail, it was weird. I was in a strange hyper-manic state. There was a buzzing sound in my head. I was hallucinating. I was communicating with family through cinder block walls.
¶ 17. On cross-examination, Dr. Lott conceded that someone who had evaluated Nolan closer to the time of the incident would have a better assessment of Nolan’s mental state but noted that “no one assessed the issue of insanity” after the shooting. He also noted that there is no documentation supporting the notion that Nolan was hearing command hallucinations when he shot his father.
¶ 18. Following the trial, the circuit court concluded that Nolan was sane at the time of the shooting and convicted him of heat-of-passion manslaughter.
¶ 19. Additional facts, as necessary, will be relayed during our analysis and discussion of the issues.
ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 20. Motions for directed verdicts challenge the sufficiency of the evidence. Boone v. State, 973 So.2d 237, 242 (¶ 18) (Miss.2008) (quoting Brown v. State, 970 So.2d 710, 712-13 (¶ 7) (Miss.2007)). Additionally, it is well established that:
“the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” [Bush v. State, 895 So.2d 836, 843 (¶ 16) ] (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). The evidence must show “beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.” Id. (quoting Carr v. State, 208 So.2d 886, 889 (Miss.1968)). If, keeping in mind the reasonable-doubt standard, “reasonable and fair-minded [jurors] in the exercise of impartial judgment might reach different conclusions on every element of the offense,” the evidence will be deemed to have been sufficient. Id. (quoting Edwards v. State, 469 So.2d 68, 70 (Miss.1985)).
Id. On the other hand, motions for a new trial challenge the weight of the evidence. Id. Our supreme court has consistently held that a jury verdict will not be disturbed unless “it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Id. (quoting Brown, 970 So.2d at 713 (¶ 8)).

*918
1. Nolan’s Sanity at the Time of the Homicide

¶ 21. Nolan contends that the circuit court erred in refusing to grant his motion for a directed verdict. Specifically, he argues that the State failed to prove that he was sane at the time of the killing. He further argues that the State failed to prove each element of heat-of-passion manslaughter.
¶ 22. As stated, the State entered into evidence a Stipulation of Facts and then rested its case-in-chief. The Stipulation of Facts reads as follows:
1. That Clinton Wyatt Nolan did on the 26th of May, 2006 in DeSoto County, Mississippi shoot and kill Donald Nolan, a human being, by the use of a dangerous weapon, to-wit: a handgun.
2. The parties further stipulate to the authenticity of, and to the admission into evidence of, the following documents:
a. The 911 recording and transcript of the telephone call on May 26, 2006;
b. The transcripts from Crichton University and Northwest Community College of Clinton Wyatt Nolan;
c. Clinton Wyatt Nolan’s medical records from Lakeside Behavior[al] Health Systems;
d. Autopsy report of Donald Nolan; and,
e. Statements made by Clinton Nolan to [DeSoto County Sheriffs Department] investigators and transcript thereof.
¶ 23. During the 911 call, the dispatcher asked Nolan whether his father had been shot accidentally. Nolan told the dispatcher that he had “acted out of emotion” when he shot his father.[10] Nolan also told the dispatcher that he had shot his father with a “.357 Sig.” Shortly thereafter, Donald got on the telephone with the 911 dispatcher. The dispatcher asked Donald why Nolan had shot him, and Donald responded that “[Nolan] was having (unintelligible) problems.”[11] Donald told the dispatcher that Nolan “is having an episode because his medicine is messed up.” Further, the transcript of the 911 call reveals that Donald was asleep immediately prior to the shooting and awoke when he heard a noise.
¶ 24. The circuit judge concluded in his ruling that Nolan was not insane pursuant to the M’Naghten standard when he killed his father. It has long been established in this State that:
To establish a defense on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong. (R. Perkins, Criminal Law 859 (2d ed.1969) (quoting from M’Naghten’s Case, 10 Clark & F. 200, 210, 8 Eng. Rep. 718, 722 (1843))). In applying this rule, there is a presumption that the accused is sane; and therefore, the burden is initially on the defendant to introduce evidence creating a reasonable doubt of his sanity. Herron v. State, 287 So.2d 759 (Miss.1974); *919 Ford v. State, 73 Miss. 734, 19 So. 665 (1896). However, once the defendant has overcome this initial burden, it is the burden of the State to present sufficient evidence to prove the defendant’s sanity beyond a reasonable doubt. Lias v. State, 362 So.2d 198 (Miss.1978); Myrick v. State, 290 So.2d 259 (Miss.1974). Expert witnesses are frequently used, as well as lay witnesses, to state their opinions of the accused’s mental state with regard to the M’Naghten Rule. Such opinions must be based on personal knowledge, and the jury is not bound to accept the conclusions of any expert. Hollins v. State, 340 So.2d 438 (Miss.1976); Smith v. State, 245 So.2d 583 (Miss.1971).
Edwards v. State, 441 So.2d 84, 86-87 (Miss.1983).
¶ 25. Prior to reaching his ultimate conclusion, the circuit judge stated the following:
Based on the totality of the circumstances and the evidence which was presented in this case, the Court finds that the State of Mississippi has in fact proven Mr. Nolan to be legally sane beyond a reasonable doubt as required under the stringent requirements of the State of Mississippi’s McNaughton [sic] rule. The Court finds that Mr. Nolan obviously knew the nature and the quality of his physical acts and the physical consequences of those acts. The Court has heard nothing by way of testimony that would contradict that first prong, and as noted, that is obviously a difficult prong to meet. The real issue is whether Mr. Nolan knew what he was doing was wrong.
I find that the greater weight of the evidence and the evidence which shows beyond a reasonable doubt that Mr. Nolan was in fact sane at the time of the crime, the most telling piece of evidence is the 911 tape. I find that Mr. Nolan was extremely lucid and logical on the tape, clearly expressed with no problem what had happened, using forensic terminology, was able to convey at the request of his dying father what type of weapon had been used, certainly showed emotional outburst and remorse during the 911 conversation. There is nothing the Court finds about the 911 conversation or any evidence that has been presented to this Court prior to that 911 conversation that would indicate Mr. Nolan not to know the nature and quality of his actions and that those actions would have been wrong.
I do not have the luxury of relating back Mr. Nolan’s grossly psychotic appearance the next day in the DeSoto — or later that day, I suppose, in the DeSoto County Jail relating that back to the specific moment that he chose to and did in fact shoot and kill his father; but to the extent those determinations have to be made, certainly I find the 911 tape moments after the shooting to be the most important piece of evidence in that regard.
Certainly, I will note, certainly Mr. — as required by the law and noted throughout jurisdiction and jurisdiction, certainly Mr. Nolan’s statements of remorse are also evidentiary in that regard; but the witnesses who testified regarding Mr. Nolan’s appearance within days after the shooting, I certainly heard nothing that would make me dispute anything those witnesses testified to. However, those are not or that is not the evidence as to the mental state of Mr. Nolan at the time of shooting and certainly nothing before that time indicates that he did not know the nature and quality and wrongfulness of his actions, and certainly the 911 tape would go against any claim that he did not. *920 The Court finds that Mr. Nolan and finds beyond a reasonable doubt that Mr. Nolan did in fact act out of emotion and in the heat of passion in the killing of Donald Nolan and is in fact guilty of the charge of manslaughter as set forth in the indictment....
¶ 26. The question of whether Nolan was sane at the time of the killing is a question of fact. As stated, the circuit judge found that Nolan was sane at the time of the offense. Although Nolan offered expert testimony that he was insane at that time, the State offered rebuttal expert testimony that he was not. The law is well settled that the fact-finder, here the circuit judge, is the arbiter of the credibility of the witnesses. Culp v. State, 716 So.2d 642, 644 (¶ 11) (Miss.1998) (citing Rice Researchers, Inc. v. Hiter, 512 So.2d 1259, 1265 (Miss.1987)). It is obvious that the circuit judge accepted Dr. Lott’s testimony on the question of Nolan’s sanity and not the testimonies of Drs. Hoehn and Angelillo. It was the judge’s prerogative to do so. Therefore, this issue lacks merit.

2. Heal^of-Passion Manslaughter

¶ 27. Finding that Nolan acted out of emotion when he shot his father, the circuit judge convicted him of heat-of-passion manslaughter pursuant to Mississippi Code Annotated section 97-3-35 (Rev. 2006), which reads: “The killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter.”
¶ 28. After careful consideration of the record, we conclude that the record does not support Nolan’s conviction for heat-of-passion manslaughter, as the State did not offer any evidence establishing that Nolan acted in the heat of passion when he killed his father. The Mississippi Supreme Court has defined heat of passion as:
[A] state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.
Tait v. State, 669 So.2d 85, 89 (Miss.1996) (emphasis added) (quoting Buchanan v. State, 567 So.2d 194, 197 (Miss.1990)). Nolan’s statement to the 911 dispatcher that he “acted out of emotion” when he killed his father is not sufficient to support a conviction for heat-of-passion manslaughter, as there is nothing in the record that suggests that Donald provoked Nolan by words or acts at the time of the shooting. Therefore, we find that the circuit judge erred in finding that the State proved all of the elements of heat-of-passion manslaughter.
¶ 29. Although we have found that the State failed to prove heat-of-passion manslaughter, we conclude that sufficient evidence exists to sustain a conviction for manslaughter pursuant section 97-3-47. In reaching this conclusion, we are mindful that Nolan was not indicted under section 97-3-47, which makes all killings of a human being, not designated under a specific code section, manslaughter when done without authority of law. We find that Tait, though not on all-fours with our case, is persuasive authority for the course we take.
¶ 30. In Tait, Timothy Andrew Tait and Christopher Canon had been joking and horse playing when Tait grabbed a gun, cocked it, and pointed it at Canon’s head. *921 Tait, 669 So.2d at 87. The gun dis-' charged, killing Canon. Id. Thereafter, a Jackson County grand jury indicted Tait for depraved-heart murder in violation of Mississippi Code Annotated section 97-3-19(l)(b). Id. at 86-87. At the request of the State, the jury was instructed with regard to both depraved-heart murder and heat-of-passion manslaughter. Id. at 89. The jury returned a verdict for depraved-heart murder. Id. at 87.
¶ 31. Tait appealed to the Mississippi Supreme Court, alleging that his actions did not warrant a conviction for depraved-heart murder. He argued that the evidence, at most, established that he had committed manslaughter. Id. at 87-88. However, he had not requested a manslaughter instruction at trial. The Mississippi Supreme Court agreed that Tait’s actions constituted manslaughter rather 'than murder but held that the evidence would not sustain a conviction for heat-of-passion manslaughter. Id. at 89. The court reasoned that “[tjhere was no ‘state of violent and uncontrollable rage engendered by a blow or certain other provocation given.’” Id. at 90. Instead, the supreme court held that “Tait’s actions ‘show a conscious, wanton and reckless disregard of the likely fatal consequences of his willful act which created an unreasonable risk.’ ” Id. Thus, the court reversed Tait’s murder conviction and remanded the case to the circuit court for resentencing.[12] Id. The court reasoned that “it would serve no useful purpose to subject the state and the defendant to another trial for manslaughter when the evidence has established guilt of that crime beyond a reasonable doubt.” Id. (quoting Clemons v. State, 473 So.2d 943, 945 (Miss.1985)).
¶ 32. Based on the rationale employed in Tait, we affirm Nolan’s manslaughter conviction, as we conclude that any rational trier of fact could have found beyond a reasonable doubt the essential elements of manslaughter pursuant to section 97-3-47. We decline to remand for resentencing, as the penalties for both heat-of-passion manslaughter and manslaughter pursuant to the section 97-3-47 are the same.

3. Abandonment or Modification of the M’Naghten Rule

¶ 33. Finally, Nolan argues that the M’Naghten Rule should be abandoned in this State. We decline to address this issue, as this Court lacks authority to do so. It is the prerogative of our supreme court to determine when and if the M’Naghten Rule should be abandoned.
¶ 34. THE JUDGMENT OF THE CIRCUIT COURT OF DESOTO COUNTY OF CONVICTION OF MANSLAUGHTER AND SENTENCE OF SEVEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND THIRTEEN YEARS OF POST-RELEASE SUPERVISION, WITH FIVE YEARS REPORTING AND EIGHT YEARS NON-REPORTING, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ„ CONCUR.

. We note that this is an improper reference to a verdict since Nolan waived a jury trial and consented to a bench trial. Therefore, the proper issue is not whether the circuit court erred in refusing to grant a directed verdict, but whether it erred in refusing to dismiss the charges due to insufficient evidence. We further note that at the conclusion of the State’s evidence Nolan moved for a directed verdict. However, the proper motion made to a judge sitting as a fact-finder is a motion to dismiss the charges based on insufficient evidence.

. In M’Naghten’s Case, 10 Clark & F. 200, 210, 8 Eng. Rep. 718, 722 (1843), the court announced that in order for a defendant to be criminally liable for his actions, he must have appreciated the difference between right and wrong at the time the crime was committed. Without specifically mentioning the M’Naghten Rule, the Mississippi Supreme Court in Cunningham v. State, 56 Miss. 269 (1879) announced that the test for determining whether a criminal defendant was insane at the time a crime was committed is whether he knew the difference between right and wrong.

. Section 97-3-47 reads: "Every other killing of a human being, by the act, procurement, or culpable negligence of another, and without authority of law, not provided for in this title, shall be manslaughter.”

. Donald's autopsy report reveals that he died of a "distant or near-contact and penetrating wound” to the chest.

. Dr. Hoehn stated that Nolan’s depression coexisted with his "Asperger’s disorder.”

. Dr. Hoehn explained that Klonopin is a tranquilizer that is used to treat sleep anxiety and agitation.

. While Dr. Hoehn testified that he visited Nolan on May 31, 2006, his notes indicate that he visited Nolan on May 28, 2006.

. Commander Blackson made an audio recording of the interview.

. Dr. Lott also testified that he reviewed the transcript of the 911 call; however, in his letter to the circuit court, Dr. Lott did not list the transcript as one of the documents that he had reviewed.

. Dr. Hoehn testified that Nolan had been sexually molested as a child and that Nolan felt as though his father was concerned about Nolan's sexual behavior.

. Donald spoke with the operator during most of the 911 call; however, due to the severity of his injury, he could not be understood. Thus, there are numerous instances where the transcript of the call reads "unintelligible.”

. We note that the Tait court remanded the case for resentencing under a statute that was different from the statute under which Tait was indicted. Tait, 669 So.2d at 90.