WALLER, Chief Justice,
for the Court:
¶ 1. Clinton Wyatt Nolan shot and killed his father. In a bench trial before the DeSoto County Circuit Court, Nolan pleaded insanity as his defense. The circuit judge determined that Nolan was sane at the time of the shooting and found him guilty of heat-of-passion manslaughter. Nolan was thus sentenced to seven years in the custody of the Mississippi Department of Corrections and thirteen years of post-release supervision. His appeal was assigned to the Court of Appeals. The Court of Appeals held that there was sufficient evidence to support that Nolan was sane at the time of the homicide, but it found that there was insufficient evidence to show that Nolan had acted in the heat of passion. The Court of Appeals, nevertheless, affirmed Nolan’s conviction under our general manslaughter statute and remanded the case for resentencing under that statute. Unlike the Court of Appeals, we are persuaded that there was, in fact, sufficient evidence to support that Nolan shot his father in the heat of passion. We also find that there was sufficient evidence to show that Nolan was sane at the time of the homicide, and we decline Nolan’s request that this Court abandon the M’Naghten rule as the test for insanity in this State. For these reasons, we reverse the judgment of the Court of Appeals and affirm the trial court’s conviction and sentence for heat-of-passion manslaughter.
FACTS AND PROCEDURAL HISTORY
¶ 2. The following is, in essence, a verbatim recitation of the facts as stated in the Court of Appeals’ opinion. Nolan v. State, 61 So.3d 912 (Miss.Ct.App.2010).
¶ 3. During the early morning hours of May 26, 2006, Nolan called 911 after shooting his father, Donald Nolan, in the chest in Hernando, Mississippi. Donald died shortly thereafter. In November 2006, Nolan was indicted by a grand jury for heat-of-passion manslaughter. Nolan waived his right to a jury trial. A bench trial was held on December 11, 2007, in which Nolan asserted an insanity defense.
¶ 4. At the beginning of the trial, the State and Nolan, through counsel, filed and entered into evidence a written Stipulation of Facts which stated, inter alia, that “Clinton Wyatt Nolan did on the 26th of May, 2006, in DeSoto County, Mississippi shoot and kill David Nolan, a human being, by the use of a dangerous weapon, to-wit: a handgun.” The State then rested its case-in-chief, reserving the right to call rebuttal witnesses after Nolan had presented his case-in-chief. Nolan moved for a directed verdict, which Judge Cham-berlin denied.
¶ 5. Following the denial of his motion for a directed verdict, Nolan called seven witnesses, the first of whom was Dr. Robert Hoehn. Dr. Hoehn, who had been Nolan’s psychiatrist since 1996, was qualified as an expert in the field of psychiatry. Dr. Hoehn testified that Nolan had been diagnosed with, and treated for, “Asperger’s disorder” prior to coming under his care, and that he had treated Nolan for symptoms related to “anxiety, attention deficit, and depression.” Dr. Hoehn stated that he had placed Nolan on several medications while Nolan was under his care. Dr. Hoehn testified that he had made modifications to Nolan’s medication during the month before the shooting and that it appeared that Nolan had adjusted well. However, Nolan had become more depressed and anxious, prompting Dr. Hoehn to switch his medication from Paxil to Zo *890 loft. Dr. Hoehn recalled that Nolan had seemed to be doing better when he had seen him approximately three weeks prior to the shooting. However, Dr. Hoehn stated that Nolan’s family members had contacted him the week of the shooting and had informed him that Nolan seemed more upset, was more irritated, and had not been sleeping well. Dr. Hoehn testified that he then had prescribed Klonopin, which, Dr. Hoehn explained, is a tranquilizer that is used to treat sleep anxiety and agitation. Nolan killed his father within twenty-four hours of taking the Klonopin.
¶ 6. Dr. Hoehn testified that he had visited Nolan in the DeSoto County Jail on May 31, 2006, at which time Nolan had been “very psychotic.” Dr. Hoehn explained that he meant that Nolan had been “unable to distinguish what was real and what wasn’t.” According to Dr. Hoehn, Nolan had been confused and agitated. After the shooting, Dr. Hoehn had diagnosed Nolan with depressive-type schizoaf-fective disorder. He explained that schi-zoaffective disorder lies between bipolar disorder and schizophrenia. He also noted that hallucinations are a common symptom of schizoaffective disorder and that Nolan did not experience any hallucinations before the shooting. However, he pointed out that Nolan had experienced command hallucinations after the shooting. He defined a command hallucination as a voice that tells a person to do something. When asked whether he had an opinion as to whether Nolan understood the nature and quality of his actions at the time he shot his father, Dr. Hoehn stated:
I think [Nolan] has always understood the facts of the case as it relates to that he shot his father. As far as, you know, what led to his making that decision, I think he was having very altered thinking. I don’t think he was — I think he was delusional and psychotic, and I think, you know, that he wasn’t in his right mind in terms of making decisions.
¶ 7. Dr. Hoehn concluded by saying that Nolan had never expressed to him that he had command hallucinations on the night of the shooting. Dr. Hoehn stated that he thought that Nolan “was starting to have the beginnings of a psychotic episode the week before his dad died.” Dr. Hoehn also stated that, after the shooting, Nolan was prescribed Seroquel, an antipsychotic drug.
¶ 8. Nolan posted bond and was released from jail. Dr. Hoehn explained that, following Nolan’s release, Nolan was sent to Lakeside Behavioral Health System (Lakeside) in Memphis, Tennessee, for three months. According to Dr. Hoehn, Nolan showed improvement while at Lakeside. For example, Nolan’s hallucinations diminished, and although he showed some agitation and frustration, his mood became more stable.
¶ 9. Next, Nolan called Dr. Joseph C. Angelillo, an expert in the field of forensic psychiatry. Dr. Angelillo had conducted an evaluation of Nolan a few weeks after the shooting to determine Nolan’s mental status at the time of the shooting. At the time that he had conducted the interview, Nolan had been on Seroquel for two to three weeks and was “fairly lucid.” Dr. Angelillo concluded that Nolan had not understood the nature and quality of his actions on the night of the shooting.
¶ 10. Margaret Cashion, a nurse who had worked at the DeSoto County Jail during Nolan’s incarceration, testified that, while being housed in a holding cell on May 26, 2006, Nolan had become aggressive and agitated. According to Cashion, she was called to render assistance after Nolan struck an officer on the nose. Cashion testified that when she reached Nolan’s cell, he was talking to a wall, and that she was told that he had been hitting *891 his head against the wall prior to her arrival. Cashion stated that Nolan was allowed to speak with his mother after complying with Cashion’s request to calm down. Cashion testified that she contacted Dr. Hoehn at some point thereafter and that he prescribed psychotropic medication which, in her opinion, positively affected Nolan’s behavior.
¶ 11. In addition, several friends of the Nolan family testified on Nolan’s behalf. Lynn Ford, who had visited Nolan on a daily basis while he was incarcerated, recalled that, during one visit, Nolan had asked her if she heard people talking, even though there was no one else in the room. Ron Donahoo had visited Nolan while Nolan was at Lakeside and described Nolan as being agitated and frustrated about the circumstances surrounding why he was there.
¶ 12. J. Hickman testified about a telephone conversation that he had with Donald shortly before the shooting. According to Hickman, Donald told him that Nolan’s condition had deteriorated, as Nolan had become agitated and was having trouble sleeping.
¶ 13. Like Ford, Hickman had visited Nolan while Nolan was incarcerated. According to Hickman, Nolan had been incoherent, agitated, confused, and fidgety. Nevertheless, he noted that Nolan had expressed remorse for his father’s death, even though he did not indicate that he knew what had happened to his father.
¶ 14. James Wendell Sanders had lunch with Nolan and Donald on the day before the killing and testified that Nolan had been withdrawn and “was not acting like his normal self.” Sanders noted that he had not seen Nolan in that state before.
¶ 15. The State then offered several rebuttal witnesses, including Commander Mark Blackson with the DeSoto County Sheriffs Department and clinical psychologist Dr. W. Criss Lott. Blackson interviewed Nolan on the morning of the shooting and testified regarding the interview. Blackson testified that Nolan had acknowledged shooting his father and that Nolan had expressed remorse for doing so. Blackson noted that the tape depicts an instance when the tape recorder was on and Nolan was talking, but he stopped abruptly and asked whether the recorder was on. Blackson answered affirmatively. Then, according to Blackson, Nolan became quiet and ceased talking. Blackson then turned the recorder off. Later, Blackson turned the recorder on again, and Nolan just looked at it and remained silent. Blackson then terminated the interview.
¶ 16. Dr. Lott, at the State’s request, had interviewed Nolan one week before Nolan’s trial. Dr. Lott was charged with providing a psychological assessment and an evaluation of Nolan’s mental state at the time of the killing. Dr. Lott had reviewed the following: (1) the transcript of Nolan’s interview conducted by Blackson, (2) two psychological evaluations conducted in June 2006 by Drs. Angelillo and Robert Serino, (3) Dr. Hoehn’s medical records, and (4) Nolan’s medical records from Lakeside. Dr. Lott opined that Nolan had been mentally ill at the time of the shooting, but that his mental illness did not impact his ability to understand the nature and quality of his actions. According to Dr. Lott, he reached this conclusion because Nolan was very familiar with guns and was able to tell the 911 operator that he had shot his father with a .357 handgun. Dr. Lott surmised that Nolan “obviously knew that this was a gun, and that indicates to me that [he knew] nature and quality.” Further, Dr. Lott testified that when Nolan had spoken with Dr. Hoehn two days after the shooting, Nolan had been clearly aware of what had transpired. *892 Dr. Lott explained that, in his opinion, Nolan’s mental illness did not “preclude his knowing that this is a gun, and if I shoot at someone, I’m going to hurt someone.” Dr. Lott also testified that Dr. Hoehn had failed to explain how Nolan did not know what would happen if he pointed the gun and fired it at his father.
¶ 17. In addition to his trial testimony, Dr. Lott sent a letter to the circuit court, in which he wrote the following:
It is unclear to this examiner exactly what Mr. Nolan heard, as he gave inconsistent statements. He initially said that he could not recall what happened on the day of the offense, and did not spontaneously report hearing voices telling him to kill anyone, but his mother encouraged [him] to recall what happened, and concurred that he heard voices telling him to kill his father. It should be noted that the mother reported that he had not told anyone in the family that he was hearing voices regarding his father calling him names or voices telling him to kill his father.... Asked to describe what he was thinking and feeling on the day of the alleged offense, he said, “I was worried that my brain wasn’t functioning right. I got up, don’t remember the time. My brain wasn’t functioning. I heard voices telling me that my father said I was a sociopath. Voices said I had to go kill him. I picked up my pistol I had under my bed for self-defense. I decided to pick up the gun and shoot him. I went upstairs and shot him. He woke up and told me to call 911 and I did. I was in a strange state when I shot him. I wasn’t sure what to do, confused. I told the police what happened and let them arrest me. They put my dad in the ambulance. In jail, it was weird. I was in a strange hyper-manic state. There was a buzzing sound in my head. I was hallucinating. I was communicating with family through cinder block walls.
¶ 18. On cross-examination, Dr. Lott conceded that someone who had evaluated Nolan closer to the time of the incident would have a better assessment of Nolan’s mental state but noted that “no one assessed the issue of insanity” after the shooting. He also noted that there was no documentation supporting the notion that Nolan had been hearing command hallucinations when he shot his father.
¶ 19. Following the trial, the circuit court concluded that Nolan was sane at the time of the shooting and convicted him of heat-of-passion manslaughter. Nolan, 61 So.3d at 913-17.
¶ 20. Before the Court of Appeals, Nolan asserted that: (1) the trial court had erred in failing to grant Nolan’s motion for directed verdict; (2) the trial court had erred in finding that the State had proven beyond a reasonable doubt that Nolan was sane at the time of the shooting; and (3) that the M’Naghten Rule[1] should be replaced. Nolan, 61 So.3d at 913. The Court of Appeals found that the State did not produce sufficient evidence to support a conviction of heat-of-passion manslaughter, but found that the facts supported a conviction of manslaughter under Mississippi Code Section 97-3-47 (Rev.2006) and thus upheld Nolan’s sentence. Nolan, 61 So.3d at 913-14.
¶ 21. Nolan then filed this petition for writ of certiorari, in which he asserts: (1) that the Court of Appeals erred in converting his heat-of-passion manslaughter conviction to a conviction under our general manslaughter statute; (2) that the M’Naghten Rule should be replaced in Mississippi; and (3) that the Court of Ap *893 peals erroneously upheld the trial court’s determination that Nolan was sane at the time of the shooting.
DISCUSSION
I. The evidence was sufficient to sustain Nolan’s conviction for heat-of-passion manslaughter under Section 97-3-35.
¶ 22. Before the Court of Appeals, Nolan argued that the State did not present any evidence to show that he had acted in the heat of passion, and, therefore, the trial court erred in finding that there was sufficient evidence to support a conviction of heat-of-passion manslaughter. Nolan, 61 So.3d at 913-14. The Court of Appeals agreed that there was insufficient evidence to convict Nolan of heat-of-passion manslaughter, but found that the evidence was sufficient to convict him of culpable-negligence manslaughter under Section 97-3-47. Nolan, 61 So.3d at 921.
¶ 23. We need not address the propriety of the Court of Appeals’ decision to convert Nolan’s heat-of-passion manslaughter conviction to a general manslaughter conviction, because we find that there was sufficient evidence to show that Nolan acted in the heat of passion.
¶ 24. In reviewing a challenge to the sufficiency of the evidence, “the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Bush v. State, 895 So.2d 836, 843 (Miss.2005) (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). The evidence will be deemed sufficient if, bearing in mind the reasonable-doubt standard, “reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense.... ” Bush, 895 So.2d at 843 (citing Edwards v. State, 469 So.2d 68, 70 (Miss.1985)).
¶ 25. The indictment charged that Nolan “did wilfully, unlawfully and felo-niously, kill one Donald Nolan, a human being, without malice, in the heat of passion, by the use of a dangerous weapon, to-wit: a handgun, without authority of law and not in necessary self-defense, in violation of Section 97-3-35.... ” Section 97-3-35, in turn, defines manslaughter as “[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense.... ” Miss. Code Ann. § 97-3-35 (Rev.2006).
¶ 26. This Court has defined “heat of passion” as:
[A] state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.
Tait v. State, 669 So.2d 85, 89 (Miss.1996) (quoting Buchanan v. State, 567 So.2d 194, 197 (Miss.1990)).
¶ 27. The Court of Appeals concluded that, even though Nolan had told the 911 dispatcher that he had “acted out of emotion,” there was nothing in the record to show that Donald had provoked Nolan with words or acts at the time of the shooting. The record, however, indicates that Nolan was angry with his father for calling him a sexual deviant or something of the like. In his psychological evaluation *894 of Nolan, Dr. Angelillo suspected that Nolan’s “hallucinations and delusions had to do with [Donald] talking about [Nolan] being a sexual abuser, perpetrator, pervert, etc.” And, after visiting Nolan in jail, Dr. Hoehn noted that Nolan was “somewhat tangential in his thinking and seemed to imply that his father had intimated he was a perpetrator.” Dr. Lott, in his assessment of Nolan, determined that:
[I]t is unclear to this examiner when, and if, he heard voices telling him to kill his father, as there was nothing in the medical records that indicated that he was hearing voices telling him to kill his father. It appears that there had been a previous conversation with the father regarding in inappropriate sexual behavior by Mr. Nolan (based on Dr. Hoehn’s notes), and Mr. Nolan became fixated on the belief that his father, and possibly a professor, was stating that he was a sexual deviant, and his father hated him. It is unclear to this examiner if Mr. Nolan was experiencing auditory hallucinations, or if he was ruminating excessively, in more of an obsessive compulsive manner, and he was angry with the father for calling him a sexual deviant.
¶ 28. Considering this evidence, it appears that a reasonable fact-finder could have found that Donald had made certain statements that had provoked Nolan’s actions. The question then, of course, is whether the provocation could have been found immediate and reasonable.
¶ 29. Donald was asleep immediately prior to the shooting, and it is unclear when precisely he made the sexual-deviant comments to Nolan.
¶ 30. Issues surrounding immediacy, i.e., whether a sufficient “cooling off’ period has passed between the provocation and the killing so as to negate that the crime occurred in the heat of passion, are questions of fact. Hartfield v. State, 186 Miss. 75, 189 So. 530, 532 (1939); Haley v. State, 123 Miss. 87, 85 So. 129, 131 (1920) (quoting 1 Wharton’s Criminal Law (10th ed.) ¶480). This Court long ago stated that such questions must be resolved based upon the specific facts of the case and the conditions or temperament of the defendant. Haley, 85 So. at 131-32.
¶ 31. In Haley, the defendant was indicted for murdering a man in the waiting room of a train station. Id. at 129. Two days earlier, the defendant’s wife had confessed that she and the victim had committed adultery. Id. at 130. And the day before the shooting, the defendant’s wife had informed him that the victim had boasted of having “illicit relations” with the defendant’s adult daughter. Id. Witnesses’ testimony established that the news had enraged the defendant, and that he had not eaten or slept from the time that he learned of the adultery until the homicide. Id. His sole defense at trial, like the case before us, was insanity. Id. at 129. The jury ultimately convicted the defendant of heat-of-passion manslaughter. Id. This Court, despite a two-day passage of time between the provocation and the killing, affirmed the conviction. Id. at 130-34. The Court reasoned that there is no fixed period of time for cooling, and that such questions depend upon the circumstances and, sometimes, the temperament of the defendant. Id. at 132. The Court found that: “All of the testimony for the defendant in the present case tends to show that the defendant was in a constant state of agitation from Monday night until Wednesday afternoon, and acted under great excitement at the time he fired the shot.” Id. Notably, the Court added that, even though most of the evidence concerning defendant’s state of mind had been introduced for the issue of insanity, “its necessary effect was to establish the existence of passion, or at least to warrant the *895 jury in finding that the unlawful act was done in the heat of passion.” Id.
¶ 32. The evidence in this case showed that Nolan had become obsessed with the notion that he had been accused of being a sexual deviant. Dr. Lott described Nolan as being “angry with [his] father for calling him a sexual deviant.” According to Dr. Angelillo, Nolan was “particularly vulnerable” to such accusations, because Nolan had been sexually molested earlier in life. There was testimony that Nolan had-not slept in the days leading up to the shooting. The day before the shooting, Nolan was described as being “withdrawn inside himself’ and “disturbed.” Furthermore, he said that he “acted out of emotion,” and that he “couldn’t control this [the shooting].”
¶ 38. Given the facts of this case, we find that there was sufficient 'evidence that, in the days preceding the shooting, Nolan was in a constant state of agitation, predicated upon his father’s comments regarding his sexuality. Nolan, moreover, was said to be especially sensitive to such statements because of earlier life experiences. Accordingly, we find that a reasonable fact-finder could have found that Nolan had acted in the heat of passion.
II. Sufficient evidence existed to conclude that Nolan was sane at the time of the shooting.
¶ 34. The Court of Appeals found that Nolan’s sanity at the time of the shooting was a question of fact, that there was conflicting expert testimony on the subject, and that the circuit judge had the prerogative to accept the testimony of the State’s expert as opposed to Nolan’s experts. Nolan, 61 So.3d at 919-20. We agree.
¶ 35. Mississippi follows the M’Naghten standard for determining whether a defendant was sane at the time of the crime. Hearn v. State, 3 So.3d 722, 738 (Miss.2008) (citing Woodham v. State, 800 So.2d 1148, 1158 (Miss.2001)). To be deemed insane under the M’Naghten test, the defendant must be “ ‘laboring under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing or (2) if he did know it, that he did not know that what he was doing was wrong.’ ” Hearn, 3 So.3d at 738 (quoting Woodham, 800 So.2d at 1158). The opinions of experts and lay witnesses frequently are used to establish an accused’s mental state. Edwards v. State, 441 So.2d 84, 86-87 (Miss.1983). The determination of sanity is within the province of the fact-finder, typically a jury or a circuit judge in a bench trial. Hearn, 3 So.3d at 738 (citing Woodham, 800 So.2d at 1158).
¶ 36. A defendant is presumed to be sane until some reasonable doubt of sanity arises. Hearn, 3 So.3d at 738 (citing Roundtree v. State, 568 So.2d 1173, 1181 (Miss.1990)). Once reasonable doubt of sanity is created, the State must prove the defendant’s sanity beyond a reasonable doubt. Hearn, 3 So.3d at 738 (citing Roundtree, 568 So.2d at 1181).
¶ 37. At the very beginning of the 911 call, Nolan informed the dispatcher that “I got a GSW to the body.” When the operator asked Nolan who shot the man, Nolan said, “I did.” After giving the operator his full name, Nolan commented, “I can’t believe I did that.” He later told the dispatcher that he had “acted out of emotion” when he shot his father. He also told the dispatcher that he had shot his father with a “.357 Sig.” Shortly thereafter, Donald got on the telephone and spoke to the 911 dispatcher. The dispatcher asked Donald why Nolan had shot him, and Donald responded that “[Nolan] was having (unintelligible) problems.” Donald told the dis *896 patcher that Nolan “is having an episode because his medicine is messed up.”
¶ 38. The circuit judge found that the State had proven beyond a reasonable doubt that Nolan was sane at the time of the shooting. Nothing, he said, contradicted that Nolan “knew the nature and the quality of his physical acts and the physical consequences of [his] acts.” He concluded further that Nolan knew that what he was doing was wrong. In making his determination, the circuit judge found the 911 tape particularly convincing:
I find that the greater weight of the evidence and the evidence which shows beyond a reasonable doubt that Mr. Nolan was in fact sane at the time of the crime, the most telling piece of evidence is the 911 tape. I find that Mr. Nolan was extremely lucid and logical on the tape, clearly expressed with no problem what had happened, using forensic terminology, was able to convey at the request of his dying father what type of weapon had been used, certainly showed emotional outburst and remorse during the 911 conversation. There is nothing the Court finds about the 911 conversation or any evidence that has been presented to this Court prior to that 911 conversation that would indicate Mr. Nolan not to know the nature and quality of his actions and that those actions would have been wrong.
I do not have the luxury of relating back Mr. Nolan’s grossly psychotic appearance the next day in the DeSoto — or later that day, I suppose, in the DeSoto County Jail relating that back to the specific moment that he chose to and did in fact shoot and kill his father; but to the extent those determinations have to be made, certainly I find the 911 tape moments after the shooting to be the most important piece of evidence in that regard. Certainly, I will note, certainly Mr. — as required by the law and noted throughout jurisdiction and jurisdiction, certainly Mr. Nolan’s statements of remorse are also evidentiary in that regard; but the witnesses who testified regarding Mr. Nolan’s appearance within days after the shooting, I certainly heard nothing that would make me dispute anything those witnesses testified to. However, those are not or that is not the evidence as to the mental state of Mr. Nolan at the time of shooting and certainly nothing before that time indicates that he did not know the nature and quality and wrongfulness of his actions, and certainly the 911 tape would go against any claim that he did not. The Court finds that Mr. Nolan and finds beyond a reasonable doubt that Mr. Nolan did in fact act out of emotion and in the heat of passion in the killing of Donald Nolan and is in fact guilty of the charge of manslaughter as set forth in the indictment....
¶ 39. Sufficient evidence existed in this case to determine that Nolan was sane at the time of the shooting. Though Dr. Lott conceded that Nolan’s behavior was related to his mental illness, he opined that Nolan recognized the wrongfulness of his actions based upon Nolan’s coherent conversation with the 911 dispatcher. The circuit judge had the right to rely upon Dr. Lott’s expert opinion and not the opinions of Drs. Hoehn and Angelillo.
III. This Court elects not to abandon or modify its longstanding adherence to the M’Naghten Rule.
¶ 40. Nolan argues that this Court should abandon the M’Naghten standard. We decline to do so.
¶ 41. Other appellants previously have urged this Court to abandon the M’Naght *897 en standard. Burk v. State, 506 So.2d 993, 993 (Miss.1987); Hill v. State, 339 So.2d 1382 (Miss.1976); Jones v. State, 288 So.2d 833, 834 (Miss.1974). This Court has refused to do so in each instance. Burk, 506 So.2d at 993; Hill, 339 So.2d at 1385; Jones, 288 So.2d at 834. In Hill, the Court acknowledged that M’Naghten is' not perfect; nevertheless, it found M’Naghten to be the safest means 'of testing criminal responsibility. Hill, 339 So.2d at 1385.
CONCLUSION
¶ 42. We find that there was sufficient evidence to conclude that Nolan was sane when he shot his father, and that Nolan did so in heat-of-passion manslaughter. Additionally, we decline to abandon the M’Naghten rule as the test for insanity in this State. We therefore reverse the judgment of the Court of Appeals and affirm the trial court’s conviction and sentence of Nolan for heat-of-passion manslaughter.
¶ 43. THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE CIRCUIT COURT OF DESOTO COUNTY IS AFFIRMED. CONVICTION OF MANSLAUGHTER AND SENTENCE OF SEVEN (7) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND THIRTEEN (13) YEARS OF POST-RELEASE SUPERVISION, WITH FIVE (5) YEARS REPORTING AND EIGHT (8) YEARS NON-REPORTING, AFFIRMED.
LAMAR AND PIERCE, JJ., CONCUR. RANDOLPH, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER, J. CARLSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., AND KITCHENS, J. KING, J., NOT PARTICIPATING.

. M'Naghten’s Case, 10 Clark & F. 200, 210, 8 Eng. Rep. 718, 722 (1843).