# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-KA-01055-COA

**JOHNNY WILLIAM WILLIAMS A/K/A**                **APPELLANT**
**JOHNNY WILLIAMS A/K/A JOHNNY**
**WILLIAM WILLIAMS, JR.**

**v.**

**STATE OF MISSISSIPPI**                                       **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/23/2015 |
| TRIAL JUDGE: | HON. WILLIAM A. GOWAN JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: MOLLIE MARIE MCMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: SCOTT STUART |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF CAPITAL MURDER AND SENTENCED TO LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT ELIGIBILITY FOR PAROLE |
| DISPOSITION: | AFFIRMED - 01/03/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., BARNES AND ISHEE, JJ.**

**BARNES, J., FOR THE COURT:**

¶1. A Hinds County jury convicted Johnny Williams of capital murder in the killing of his seventeen-month-old daughter, Jada Williams. Williams was sentenced to life in the custody of the Mississippi Department of Corrections without the possibility of parole. Williams now appeals. He argues jury instruction S-3 was improperly granted, which

permitted the jury to find Williams guilty of the underlying felony of child abuse without finding he actually abused the child. Williams also claims to have received ineffective assistance of counsel due to the admission of graphic photographs of Jada's body. Finding no error, we affirm.

## STATEMENT OF THE FACTS AND PROCEDURAL HISTORY

¶2. On July 3, 2012, at 3:45 p.m., Officer LaShanda Griffin of the Jackson Police Department responded to a call about an unconscious infant, later identified as Jada Williams, who was brought to the emergency room (ER) of the Central Mississippi Medical Center (CMMC) in Jackson, Mississippi. Officer Griffin was informed by a nurse that the child was stiff when her mother brought her in. Officer Griffin testified that Jada had bruises on her hips, buttocks, and legs.

¶3. Brandon Goldsmith, an ER nurse at CMMC, testified that when Jada was brought into the ER at 3:45 p.m., she was unresponsive, not breathing, and had no pulse. Medical staff attempted to open Jada's airway, but her jaws were locked; so they could not open her mouth. Also, they were unable to obtain IV access in Jada's arm because her arm was so rigid. Goldsmith explained that Jada's stiffness indicated rigor mortis; thus, Jada had been dead for several hours. Goldsmith observed several bruises on Jada's torso and legs, which were present before cardio-pulmonary resuscitation (CPR) was attempted. Medical staff attempted CPR, but Jada was pronounced dead at 3:50 p.m. Officer Griffin called her supervisor, the mobile-crime unit, robbery-homicide detectives, and the coroner to the hospital.

¶4. Officer Charles Taylor of the Jackson Police Department also responded to the call

2

at CMMC, and took photographs of Jada's body in the trauma room of the ER. Thirty-one photographs of Jada's body were entered into evidence at trial without objection from the defense. Based on his experience, Officer Taylor testified that it appeared Jada had been severely beaten. Later, Officer Taylor also went to the apartment where Jada, her parents, and their two other small children lived. He took photographs of the apartment, and recovered clothing items and a belt.

¶5. Jasmine Porter, Jada's mother and Williams's co-indictee, testified against Williams at trial. Jasmine maintained that she was not offered "a deal" in exchange for testifying. Jasmine lived with Williams and their three children at the Vintage Apartments in Jackson on Ellis Avenue. In addition to Jada, the couple had a two-year-old child and a six-month-old child. The day Jada died, the family had been at home, arising at around 10:30 or 11:00 a.m. Jasmine explained that Jada had "an accident" on the couch; she was not wearing diapers because they were potty training her. Jasmine cleaned Jada up, and the family went to pay the light bill at a store on Capitol Street.

¶6. Upon returning home, Jasmine put Jada in the bathtub to play while she cleaned the kitchen and dining area. Jasmine went outside to smoke and talk to a neighbor for about five to ten minutes. When she came back inside, Williams was talking to Jada, who was on the bed limp, and neither moving nor breathing. Jasmine thought Jada was having a "breathing attack." She grabbed Jada and asked what was wrong with her, but Williams said she was fine.

¶7. Since Jada was not breathing, Jasmine attempted CPR, but admitted she did not know

3

how to perform it properly. Williams was "panicky" and hysterical, as was Jasmine, who suggested that they take Jada to the hospital. Instead, they decided to go to the home of Williams's mother, Beatrice Williams, near County Line Road. Williams drove, and it took ten or twenty minutes. Williams told Jasmine that he had "whooped" Jada because she had had an accident. Jasmine asked Williams a couple of times to take Jada to the hospital, but Williams was too afraid.

¶8.     Once at Beatrice's home, Williams told his mother he had whipped Jada with a belt, and something was wrong with her. Beatrice put Jada in the kitchen sink and splashed water on her face to "try to get her back." Beatrice testified that Jada grabbed her finger at one point. Jasmine attempted CPR again. Rachel Williams, Williams's sister, told the couple to take Jada to the hospital. Williams responded that he "didn't want to go to jail," preventing Rachel from calling an ambulance by taking her telephone away. After unsuccessfully trying to revive Jada, Willams, Jasmine, Beatrice, and Rachel, all got into Williams's truck with Jada and the six-month-old baby and went back to the couple's apartment to get supplies for the baby. Jasmine, Beatrice, and Rachel all suggested to Williams, who was driving, to take Jada to the hospital. Instead, they went back to Beatrice's home to drop off Beatrice, Rachel, and the baby.

¶9.     Leaving Beatrice's home, Williams drove Jasmine and Jada to his brother Kelsey Williams's house in Jackson. Kelsey got in the truck and insisted that Williams immediately take Jada and Jasmine to the hospital. Driving directly to CMMC, Williams dropped off Jasmine and Jada, and left. Jasmine never saw Williams again.

4

¶10. Forensic pathologist Lisa Funte, with the state medical examiner's office, performed Jada's autopsy. Fifteen photographs of Jada's body during the autopsy were entered into evidence to corroborate her testimony, without objection from the defense. Dr. Funte determined Jada's cause of death was blunt-force injuries, and the manner of death was homicide. She testified there was evidence of extensive past and present injuries to Jada's body. Internal injuries included bleeding on the brain, hemorrhages in her abdominal cavity, and a large hematoma on her liver and one kidney; further, Jada's pancreas had been split in two by her backbone. All of these injuries were due to blunt-force trauma. Externally, Jada had old and new bruises on her hip, buttocks, legs, abdomen, and arms, with lighter bruising on her head, face, neck, and throat. Further, she had scarring on the side of her neck and back. The internal-bleeding injuries were caused the same day Jada died. Dr. Funte could not estimate how long Jada had lived after these injuries. The head and abdominal injuries alone were life-threatening. Since Jada had no broken bones, Dr. Funte testified that Jada had been beaten, as opposed to falling or being in an automobile accident. Moreover, Jada's injuries could not have been caused by improper CPR techniques.

¶11. At trial, Williams testified in his own defense. He admitted to spanking Jada on her buttocks with a belt because she had an accident. He left the room, and upon returning, she was limp and unresponsive. Williams admitted that he told his sister not to call an ambulance because he feared the police would be called. He told his brother that Jada was "gone." Williams did not believe his "whooping" caused Jada to die. He denied punching Jada or hitting her in the head. He mentioned that his children had spent a couple of days

5

with a friend immediately prior to Jada's death.

## ANALYSIS

### I.      Jury Instruction S-3

¶12.    Williams argues the trial court erred in granting jury instruction S-3 over his objection, because it allowed the jury to find Williams guilty of capital murder if he allowed someone else to abuse Jada.

¶13.    Jury instructions "must be read as a whole . . . . [I]f the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss. 2010) (quoting *Rubenstein v. State*, 941 So. 2d 735, 784-85 (¶224) (Miss. 2006)). The grant or denial of jury instructions is within the discretion of the trial court. *Id.* (citing *Davis v. State*, 18 So. 3d 842, 847 (¶15) (Miss. 2009)).

¶14.    Williams was charged with capital murder, in violation of Mississippi Code Annotated section 97-3-19(2)(f) (Rev. 2014), or effecting the death of Jada "while in the commission of the crime of felonious abuse and/or battery of a child," as prohibited by Mississippi Code Annotated section 97-5-39(2) (Rev. 2014). Section 97-5-39(2) defines various types of felonious child abuse; pertinent here is subsection (c): "Any person shall be guilty of felonious child abuse . . . [i]f serious bodily harm to any child actually occurs, and if the person shall intentionally, knowingly or recklessly . . . [s]trike any child on the face or head; . . . [d]isfigure or scar any child; . . . [or] [w]hip, strike, *or otherwise abuse* any child[.]" Miss. Code Ann. § 97-5-39(2)(c)(i)-(iii) (emphasis added).

¶15.    The trial court granted the State's proposed jury instructions on the elements of capital

6

murder and felony child abuse in S-1 and S-2 respectively. Instruction S-2 stated the elements of felonious child abuse: that "Johnny Williams . . . did intentionally whip, strike or otherwise abuse Jada . . . in such a manner as to cause serious bodily injury . . . ." The trial court also granted instruction S-3, which defined when a child has been "otherwise abused." Instruction S-3 stated:

> If you find beyond a reasonable doubt that Johnny Williams was the father, guardian or custodian of Jada Williams, or that he was responsible for her care or support, whether legally obligated to do so or not, and you find that he intentionally caused *or allowed to be caused* upon Jada Williams, nonaccidental physical injury to Jada Williams, through whipping or striking Jada Williams[,] then you shall find that Johnny Williams did abuse Jada Williams; and/or,
>
> If you find beyond a reasonable doubt that Johnny Williams was the father, guardian or custodian of Jada Williams, or that he was responsible for her care or support, whether legally obligated to do so or not, and you find that he did intentionally otherwise abuse Jada Williams by failing to provide necessary medical treatment to Jada Williams, then you shall find that Johnny Williams did abuse Jada Williams.

(Emphasis added). Williams argues that the first paragraph of instruction S-3 allowed the jury to find him guilty of felony child abuse, and thereby capital murder, if it found he allowed Jada to be abused by another person, rather than requiring that he actually abused her. Therefore, Williams claims this instruction was an incorrect statement of the law, and reversal of his conviction is warranted.

¶16. At trial, the State supported instruction S-3 by pointing out that it came from the definition of "abused child" found in Mississippi Code Annotated section 43-21-105(m) (Rev. 2015) of the youth-court statute, which reads: "[A] child whose parent, guardian or custodian or any person responsible for his care or support, whether legally obligated to do

7

so or not, has caused *or allowed to be caused*, upon the child . . . nonaccidental physical injury or other maltreatment." (Emphasis added). The State requested instruction S-3 to allow the jury to find Williams guilty of child abuse in two different ways: causing serious bodily injuries to Jada "through whipping or striking," or "failing to provide necessary medical treatment to Jada." At trial, the State explained the purpose of the three instructions: S-1 defined capital murder as murder during the commission of felony child abuse, S-2 defined felony child abuse, and S-3 defined what "otherwise abuse" included, which was referenced in S-2. By failing to take Jada to the hospital and preventing others from calling an ambulance, the State argued that Williams allowed Jada's injuries to cause her death.

¶17.   As the State points out, the Mississippi Supreme Court has interpreted the term "otherwise abuse" in section 97-5-39(2) to indicate a nonexhaustive list of felonious-child-abuse actions, which would include acts of omission. *Buffington v. State*, 824 So. 2d 576, 582 (¶24) (Miss. 2002). The "language of 97-5-39(1) signals the Legislature's inclusion of . . . acts of omission as abusive behavior," which would also constitute felony child abuse. *Id.*; *see also Ealey v. State*, 158 So. 3d 283, 292 (¶27) (Miss. 2015). Otherwise, allowing certain omissions, such as permitting someone else to abuse the child; refusing to feed a child on the brink of death, as in *Buffington*; "discarding" a newborn infant in a suitcase behind a church, as in *Ealey*; or failing to seek timely medical care for an unconscious infant, as here; could be charged or found by a jury only as a misdemeanor. *Buffington*, 824 So. 2d at 582 (¶24); *Ealey*, 158 So. 3d at 292 (¶27).

¶18.   Here, we find instruction S-3 was a proper statement of the law, as held by the

8

statutory analysis found in *Buffington* and *Ealey*. Williams argues that instruction S-3 allowed the jury to convict him if he allowed someone else to abuse Jada rather than him actually abusing her, or failing to provide medical treatment himself. He argues that while allowing abuse could make Jada an "abused child" under the youth-court law, it was insufficient to convict him of felony child abuse. Even if the jury instruction could have been read in this manner, any error is harmless. "There is no per se rule requiring automatic reversal whenever jury instructions contain conflicting or potentially confusing explanations of the law. In such cases, we apply traditional harmless-error or plain-error analysis, depending upon whether the defendant objected to the instruction at trial." *Rogers v. State*, 166 So. 3d 537, 544 (¶14) (Miss. Ct. App. 2014). There was no evidence presented to the jury that anyone but Williams abused Jada; so the jury could not have interpreted instruction S-3 as though it was authorized to find Williams guilty for allowing another person to abuse her. The prosecutor even withdrew an accomplice instruction as inapplicable. Accordingly, we find no error in the trial court's grant of instruction S-3.

## II. Ineffective Assistance of Counsel

¶19. Williams argues that he received ineffective assistance of counsel because defense counsel failed to object to the admission of photographs of Jada's body, both in the hospital and during the autopsy. Williams claims the photographs are gruesome, and thus unfairly prejudicial.

¶20. Usually, because the record on direct appeal is insufficient to support a claim for ineffective assistance of counsel, these claims are best brought in postconviction-relief

proceedings. *Read v. State*, 430 So. 2d 832, 841 (Miss. 1983). However, a reviewing court may address an ineffective-counsel claim on direct appeal if the issues presented are "based on facts fully apparent from the record." *Archer v. State*, 986 So. 2d 951, 955 (¶16) (Miss. 2008) (citing M.R.A.P. 22(b)). We find the record before us sufficient to decide whether Williams's counsel was constitutionally ineffective because he did not object to the photographs.

¶21. To succeed on such a claim, the defendant must prove: (1) counsel's performance was deficient, and (2) the deficiency prejudiced the defense. *Liddell v. State*, 7 So. 3d 217, 219 (¶6) (Miss. 2009) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Counsel's errors must be so serious as to deprive the defendant of a fair trial. *Id.* "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* (quoting *Strickland*, 466 U.S. at 686). "[A]n appellate court must strongly presume that counsel's conduct falls within a wide range of reasonable professional assistance, and the challenged act or omission might be considered sound trial strategy." *Id.* (quoting *Bennett v. State*, 990 So. 2d 155, 158 (¶9) (Miss. 2008)).

¶22. Without objection from defense counsel, pictures of Jada's body were entered into evidence at two different times. First, thirty-one photographs of Jada's body in CMMC's trauma room were entered into evidence as a cumulative exhibit (Exhibit 4A-EE) during Officer Taylor's examination. He took the photographs, which showed different parts of Jada's external body taken at various angles. Bruises and scars were readily apparent,

10

especially on her buttocks, back, thighs, and side torso. Additionally, during Dr. Funte's examination, the State introduced fifteen photographs (Exhibits 24-34) taken at Jada's autopsy. These photographs were more graphic, showing Jada's external, as well as internal, injuries in detail. They showed Jada's skull cap removed to expose her brain, as well as the inside of her body cavity. Photographs of her injured kidney, pancreas, and liver, separate from her body, were also shown to the jury.

¶23. Generally, admission of photographs into evidence is within the discretion of the trial court and will be reviewed on appeal for an abuse of discretion. *Barfield v. State*, 22 So. 3d 1175, 1181 (¶14) (Miss. 2009) (citing *Chamberlin v. State*, 989 So. 2d 320, 340 (¶73) (Miss. 2008)). The reviewing court must determine if the photographs were "so gruesome and inflammatory as to lack any evidentiary purpose." *Id.* (citing *McFee v. State*, 511 So. 2d 130, 134-35 (Miss. 1987)). Photographs are deemed to have evidentiary value when they "(1) aid in describing the circumstances of the killing; (2) describe the location of the body and cause of death; [or] (3) supplement or clarify witness testimony." *McIntosh v. State*, 917 So. 2d 78, 83 (¶13) (Miss. 2005) (quoting *Spann v. State*, 771 So. 2d 883, 895 (¶31) (Miss. 2000)). It is acceptable for photographs to "arouse the emotions of the jurors" as long as they serve a legitimate evidentiary purpose. *Spann*, 771 So. 2d at 895 (¶31).

¶24. Photographs of the outside of Jada's body in the hospital and at the autopsy showed it was covered in old and new bruises, contusions, abrasions, and scars. The photographs of her brain with the skull removed showed several different types of hemorrhages, indicating blunt-force injury to her head applied at "multiple sites." Dr. Funte testified these brain

11

injuries alone could have caused Jada to die. There was hemorrhage on the surface of Jada's intestines and throughout the abdominal soft tissue. One of Jada's kidneys had a hematoma, or collection of blood, on it; her liver was lacerated and contained a hematoma; and her pancreas had been cut in half by her backbone due to significant blunt-force trauma to the abdomen. Dr. Funte testified that the dissection of Jada's pancreas alone could have caused her to expire, although not immediately. A photograph of Jada's abdominal cavity with the organs removed also showed hemorrhage indicating blunt-force trauma. Dr. Funte stated that CPR could not have caused these injuries.

¶25. All of these photographs had evidentiary value, serving the purposes set forth in *McIntosh*. Moreover, even though the internal autopsy photographs were graphic, they were relevant to show the jury the extent and severity of Jada's injuries, and that her injuries were not merely superficial. They also presented the circumstances of her killing and cause of death, which Dr. Funte testified was blunt-force injury. The photographs also supplemented and clarified Dr. Funte's testimony about the descriptions of Jada's injuries, and her conclusion that Jada was beaten to death by another person, since there was no evidence of another significant trauma like a fall or vehicle accident. This relevance outweighs any prejudicial effect.

¶26. Because the photographs were properly admitted, there can be no ineffective assistance of counsel for lack of an objection to their admission. We cannot say that the lack of an objection so undermined the adversarial process that the trial produced an unjust result. Counsel's performance was neither deficient nor prejudiced the defense. Therefore, this

12

issue is without merit.

¶27. **THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY, FIRST JUDICIAL DISTRICT, OF CONVICTION OF CAPITAL MURDER, AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT ELIGIBILITY FOR PAROLE, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, CARLTON, FAIR, WILSON AND GREENLEE, JJ., CONCUR. WESTBROOKS, J., NOT PARTICIPATING.**