# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-KA-01711-COA

NATHANIEL MCKEITHAN A/K/A NATHANIEL SABIR MCKEITHAN A/K/A NATHAN MCKEITHAN                                                     APPELLANT

v.

STATE OF MISSISSIPPI                                                                             APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 09/23/2016 |
| TRIAL JUDGE: | HON. LEE J. HOWARD |
| COURT FROM WHICH APPEALED: | NOXUBEE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: MOLLIE MARIE MCMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: KATY TAYLOR GERBER |
| DISTRICT ATTORNEY: | SCOTT WINSTON COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 01/09/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., CARLTON AND WILSON, JJ.**

**CARLTON, J., FOR THE COURT:**

¶1.     A Noxubee County grand jury indicted Nathaniel McKeithan for Count I, the burglary of a dwelling; Count II, the armed robbery of Charles Barge; and Count III, the armed robbery of Inez Barge.  *See* Miss. Code Ann. §§ 97-3-79 & 97-17-23 (Rev. 2014).  A jury convicted McKeithan of all three counts.  On appeal, McKeithan raises the following issues: (1) whether insufficient evidence existed to support the verdict as to Count III; and (2) whether the circuit court abused its discretion by refusing proposed jury instruction D-8.

¶2.     Finding no error, we affirm McKeithan's convictions and sentences.

**FACTS**

¶3.     A little before noon on June 12, 2015, Charles arrived at his home in Macon, Mississippi, to eat lunch with his wife, Inez.  As Charles walked from his car toward his house, a man who Charles later identified as McKeithan approached and asked for directions to Central Academy and Noxubee High School.  After Charles provided the directions to the two schools, McKeithan walked away on foot.

¶4.     Inez had been diagnosed with Alzheimer's disease several years earlier, and she had a caretaker who stayed with her during the day.[1]  Upon entering his home, Charles asked whether McKeithan had knocked on the door, but Inez's caretaker replied that he had not.  After eating lunch with his wife, Charles returned to work.

¶5.     Charles and Inez's neighbor, Kimberly Dziewit, testified that she was also home for lunch on June 12, 2015.  As Dziewit prepared to return to work around 12:30 p.m., someone knocked on her door.  At trial, Dziewit identified the man as McKeithan.  She testified that McKeithan asked her for directions to Noxubee High School and Central Academy and that he never mentioned he had just asked Charles for the same directions.  Dziewit stated that McKeithan told her that he was looking for work at the schools, which Dziewit thought unusual since the schools were closed for summer.  Dziewit inquired about McKeithan's vehicle, and she testified that he pointed to a silver four-door car with a maroon quarter panel that was in a nearby parking lot.  After Dziewit gave McKeithan the directions, he left, and

_____

[1] Due to her Alzheimer's disease, Inez neither provided a statement to police after the crime nor testified at McKeithan's trial.

2

she returned to work.

¶6.     Around 7 p.m. that same evening, Charles and Inez met their son and daughter-in-law, David and Yvonne Barge, for dinner.  Charles and Inez then returned home for a short time before leaving again around 9 p.m. to get milkshakes.  When they returned home with their milkshakes, Charles unlocked the house door and allowed Inez to enter first.  As Charles followed Inez into the house, two men grabbed the couple from behind and pushed them onto their living-room couch.  Charles testified that he could not identify the assailants because they wore hoods that covered their faces.  Although the assailants threw an afghan over Charles's and Inez's heads, Charles testified he could still see because the afghan was knitted and had holes in it.

¶7.     One of the assailants grabbed Charles's wallet from his pocket and asked for the personal identification number (PIN) associated with Charles's debit card.  Charles gave the man an incorrect PIN.  The assailant accused Charles of lying, and he hit Charles in the face several times.  The blows broke Charles's glasses and gave him a black eye.  Each time the assailant asked for the PIN, Charles responded with the same incorrect number.  During the burglary, the assailant picked up Charles's air rifle, which was next to the living-room couch, and he held it to Charles's head.  Although Charles knew the air rifle was not loaded, he feared the man might cause serious bodily harm to him or Inez by hitting them with the air rifle.  After about ten to fifteen minutes, the assailants left the house.  Charles testified that, in addition to his debit card, the men stole his air rifle, his phone, about $200 from Inez's purse, and at least $32,000 in jewelry, some of which they took directly from Inez's person.

3

¶8.    After the assailants fled, Charles checked on Inez and locked the door to their home. According to Charles, Inez was not herself for several days after the armed robbery and burglary.  Charles testified that, despite her Alzheimer's disease, Inez was upset and confused and that she had been afraid during the home invasion that something bad would happen to them.

¶9.    After ensuring their safety following the armed robbery and burglary, Charles called his son, David.  David then reported the crime to the police, who received the call around 9:42 p.m.  Chief Lucious Mason of the Macon City Police Department testified that he personally observed the Barges after the home invasion.  According to Chief Mason, the Barges both appeared to be in shock, and he recalled that they described being in fear of death or serious bodily injury during the incident.

¶10.    Between 9:43 p.m. and 9:45 p.m., just minutes after the police received the call about the home invasion, the surveillance video at Bank First in Macon, Mississippi, captured McKeithan's attempts to use Charles's stolen debit card at an ATM.[2]  The surveillance video, which the State played at trial, showed McKeithan in the driver's seat of a vehicle as he made several attempts to withdraw money from the ATM.  Although the video failed to clearly show the vehicle's passenger seat, trial testimony established that movement could be seen from that side of the vehicle.

---

[2] Marsha King, Bank First's vice president and bank manager, testified that the ATM surveillance video ran about four to six minutes ahead of the actual time.  Thus, while the timestamp on the footage from the surveillance video showed McKeithan trying to withdraw money at 9:49 p.m., King testified that the attempted transaction actually occurred four to six minutes earlier between 9:43 p.m. and 9:45 p.m.

¶11.   That same night, around 10:30 p.m., McKeithan again attempted to use Charles's stolen debit card.  This time McKeithan attempted to prepay for $10 worth of gas at Sam's G&G, a convenience store in Shuqualak, Mississippi.  The store owner, Sammy Lindsey, swiped the debit card McKeithan handed him, but after McKeithan entered an invalid PIN, Lindsey noticed the debit card belonged to Charles.  Lindsey knew Charles since his father and Charles were long-time friends and coworkers.  Upon realizing the debit card belonged to Charles, Lindsey refused to return the card to McKeithan, and he asked how McKeithan had acquired the debit card.  Lindsey testified that McKeithan acted nervous and stated that a man outside the convenience store had given him the debit card.  However, Lindsey never saw the man to whom McKeithan referred.  After Lindsey repeatedly refused to return the debit card, McKeithan left the convenience store.  Lindsey then called his father, who contacted Charles about the debit card.

¶12.   From the surveillance videos at the bank and the convenience store, the police developed McKeithan as a suspect in the armed robbery and burglary.  Officers arrested McKeithan the day after the crime.  At the same time they arrested McKeithan, the officers seized a silver car with a maroon quarter panel.  Charles later identified McKeithan as the man who asked him for directions when he came home for lunch on June 12, 2015.

¶13.   McKeithan testified at trial in his own defense.  He admitted that the silver car with the maroon quarter panel the police seized belonged to him.  However, McKeithan denied being near either the Barges' or Dziewit's home around lunch on June 12, 2015, and he denied asking either Charles or Dziewit for directions.  McKeithan also denied that he

committed the armed robbery and burglary.

¶14. According to McKeithan, he was in Shuqualak almost all day on June 12, 2015. Around 9 p.m. on June 12, 2015, McKeithan testified that he drove to the Sanco Food Mart to buy cigarettes. As he exited his car to walk into the food mart, McKeithan testified that a "crackhead" approached him. McKeithan stated that the man offered to sell him Charles's stolen debit card. McKeithan told the man that he did not have any cash. Instead, McKeithan gave the man some marijuana in exchange for the debit card. McKeithan testified that he immediately drove to Bank First to use the debit card and PIN the man had given him. After several unsuccessful attempts to withdraw money from Bank First's ATM, McKeithan drove to Sam's G&G to use the debit card there. However, McKeithan testified that the PIN the "crackhead" had given him again failed to work at the convenience store, and then Lindsey refused to return the debit card to him. After leaving the convenience store, McKeithan stated that he drove to another store called the Beehive, where he stayed for several hours before returning home.

¶15. After considering the evidence and testimony, the jury found McKeithan guilty of all three counts charged in his indictment. On September 23, 2016, the circuit court sentenced McKeithan to twenty years for the house-burglary conviction and to twenty-six years for each of the two armed-robbery convictions, with each sentence to be served in the custody of the Mississippi Department of Corrections, and with the sentences to run consecutively to one another and to any other sentence McKeithan might receive in a cause pending in federal

district court.[3]  McKeithan filed an unsuccessful motion for a new trial or, in the alternative, a judgment notwithstanding the verdict.  Aggrieved, McKeithan appeals.

## DISCUSSION

### I.  Sufficiency of the Evidence

¶16.  McKeithan argues the circuit court erred by denying his posttrial motion as to Count III of the indictment because insufficient evidence existed to prove that he committed armed robbery against Inez.  Specifically, McKeithan asserts the State failed to present any evidence or testimony to show "that Inez was put in fear of immediate injury by [the exhibition of] a deadly weapon."  Because McKeithan claims the State failed to prove this essential element of armed robbery beyond a reasonable doubt, he asks this Court to reverse his conviction as to Count III.

¶17.  When considering the legal sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Nolan v. State*, 61 So. 3d 887, 893 (¶24) (Miss. 2011) (citation omitted).  Sufficient evidence supports the verdict if, "bearing in mind the reasonable-doubt standard, reasonable fair-minded [jurors] in the exercise of impartial judgment might reach different conclusions on every element of the offense."  *Id.* (citation and internal quotation marks omitted).

¶18.  To prove Count III of McKeithan's indictment, the State was required to show beyond

_____

[3] In November 2009, the United States District Court for the Southern District of Mississippi entered a judgment against McKeithan for armed bank robbery.

7

a reasonable doubt that McKeithan "feloniously [took] or attempt[ed] to take from the person or from the presence the personal property of [Inez] and against [her] will by violence to [her] person or by putting [her] in fear of immediate injury to [her] person by the exhibition of a deadly weapon . . . ." Miss. Code Ann. § 97-3-79.

¶19.    On appeal, McKeithan raises no dispute as to his convictions for house burglary and armed robbery against Charles. As previously stated, he only disputes the legal sufficiency of the evidence supporting his conviction for armed robbery against Inez. McKeithan acknowledges that the Mississippi Supreme Court has held that "a victim is not required to have 'definite knowledge' of a deadly weapon in the sense that the weapon must actually be seen by the victim's own eyes." *Dambrell v. State*, 903 So. 2d 681, 683 (¶6) (Miss. 2005). Rather, as the *Dambrell* court explained, "when a defendant makes an overt act and a reasonable person would believe that a deadly weapon is present, there is no requirement that a victim must actually see the deadly weapon in order to convict pursuant to [section] 97-3-79." *Dambrell,* 903 So. 2d at 683 (¶6). Even in light of the *Dambrell* holding, McKeithan argues the State failed to prove that Inez was ever placed in fear of immediate injury to her person due to the exhibition of a deadly weapon.

¶20.    No dispute exists that two assailants forcefully entered the Barges' home on June 12, 2015, and stole personal property, including jewelry taken directly from Inez's person. Inez's Alzheimer's disease prevented her from providing a statement to police or testifying at trial. However, Charles testified about the home invasion and his wife's reaction to the crime. Although the assailants threw an afghan over Charles's and Inez's heads, Charles

8

testified that it was still possible to see what occurred because the afghan was knitted and had holes in it. Charles further testified that, at one point during the home invasion, one of the assailants picked up an air rifle next to the living-room couch and held the air rifle to Charles's head. According to Charles, this occurred after the assailant had already threatened Charles, hitting him several times in the face and breaking his glasses. Charles also stated that, even though the air rifle was unloaded, he feared the assailant would cause him or Inez bodily injury by hitting them with the air rifle.

¶21. In talking with and observing Inez after the crime occurred, Charles testified that his wife was not herself and was upset and confused. In addition, Charles stated he could tell that Inez had been afraid during the burglary and armed robbery that something bad would happen to her and Charles. The State also presented testimony from Chief Mason, who observed the Barges after the home invasion. Chief Mason stated that the Barges both appeared to be in shock when the police arrived at their home following the crime. Chief Mason also recalled that, while being interviewed by one of his officers, the Barges described being in fear of death or serious bodily injury during the incident.[4]

¶22. Considering the evidence in the light most favorable to the verdict, we find the State presented sufficient evidence for the jury to find McKeithan guilty of armed robbery against

---

[4] This Court has previously affirmed the legal sufficiency of the evidence supporting an armed-robbery conviction where the victims testified that the defendants placed them in fear during the crime by holding them at gunpoint. *See Johnson v. State*, 81 So. 3d 300, 304-05 (¶¶9-12) (Miss. Ct. App. 2012); *Hughes v. State*, 43 So. 3d 526, 528-29 (¶¶8-11) (Miss. Ct. App. 2010); *Francis v. State*, 791 So. 2d 904, 906-08 (¶¶2, 9) (Miss. Ct. App. 2001); *Grihim v. State*, 760 So. 2d 865, 867 (¶7) (Miss. Ct. App. 2000).

Inez beyond a reasonable doubt. *See Nolan*, 61 So. 3d at 893 (¶24). We therefore find this issue lacks merit.

## II. Proposed Jury Instruction D-8

¶23. McKeithan next challenges the circuit court's refusal of proposed jury instruction D-8. This Court reviews the grant or denial of jury instructions for abuse of discretion. *Williams v. State*, 222 So. 3d 1066, 1070 (¶13) (Miss. Ct. App. 2017). In so doing, we acknowledge the following:

> Jury instructions must be read as a whole to determine if the instructions were proper. Jury instructions must fairly announce the law of the case and not create an injustice against the defendant. . . . In other words, if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results.

*Davis v. State*, 18 So. 3d 842, 847 (¶14) (Miss. 2009) (internal citations and quotation marks omitted).

¶24. The circuit court refused McKeithan's proposed jury instruction D-8 as repetitive. The proposed instruction defined a deadly weapon and stated:

> It is a question of fact for the [j]ury to determine whether the air rifle claimed to have been used by Nathaniel McKeithan was a deadly weapon in the manner claimed to have been used in this case.
>
> A deadly weapon may be defined as any object, article[,] or means [that], when used as a weapon[,] is, under the existing circumstances, reasonably capable or likely to produce death or serious bodily harm to a human being upon whom the object, article[,] or means is used as a weapon.

¶25. In *Williams v. State*, 134 So. 3d 732, 737 (¶18) (Miss. 2014), the defendant appealed his armed-robbery conviction and challenged the circuit court's failure to grant an almost identical jury instruction to McKeithan's proposed instruction D-8. The *Williams* court

10

acknowledged "that this type [of] instruction better informs the jury that the question as to whether a particular instrument constitutes a deadly weapon lies with the jury." *Id.* at 737 (¶19). However, the *Williams* court found no error in the circuit court's refusal of the instruction since the circuit court properly instructed the jury on each element of armed robbery. *Id.*

¶26. Like the *Williams* court, we find that the circuit court here properly instructed the jury on each element of the armed-robbery charges against McKeithan. *Compare id.* at (¶¶17-19). The circuit court granted jury instruction S-3A, which provided:

> The [c]ourt instructs the [j]ury that Nathaniel McKeithan is charged in [Count III] with the [a]rmed [r]obbery of [Charles] Barge.
>
> If you find beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence from the evidence in this case that:
>
> 1. On or about June 12, 2015, in Noxubee County;
>
> 2. Nathaniel McKeithan unlawfully took, from the person or presence of [Charles] Barge, a Gamo Air Rifle, Samsung Galaxy phone, [j]ewelry, a Bank First credit card[,] and [$65], against his will and intending to permanently deprive [Charles] Barge of the personal property and money;
>
> 3. By exhibiting a deadly weapon to put [Charles] Barge in fear of immediate injury to himself or another person,
>
> then you shall find Nathaniel McKeithan guilty of the armed robbery of [Charles] Barge.
>
> If the State did not prove any of the above listed elements beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence, then you shall find Nathaniel McKeithan not guilty of the armed robbery of [Charles] Barge.

11

Jury instruction S-4A provided substantially the same instruction to the jury as to Count III of the indictment regarding the armed robbery of Inez.

¶27. In addition to finding that the circuit court sufficiently instructed the jury as to each element of armed robbery, we also recognize that jury instruction S-5 provided the jury with a legal definition of a deadly weapon. Instruction S-5 stated "that 'deadly weapon' means an object, article, or means [that], when used as a weapon under the existing circumstances[,] is reasonably capable or likely to produce death or serious bodily harm to another person." Jury instruction S-11 then informed the jurors that "the crime of [a]rmed [r]obbery is distinguished from the crime of [r]obbery by the exhibition of a deadly weapon." Finally, jury instruction C.01 instructed the jurors that they were "the sole judges of the facts in this case."

¶28. Thus, upon reading the jury instructions as a whole, we find that proposed jury instruction D-8 was fairly covered elsewhere in the instructions and that the jury instructions fairly and accurately announced the rules of law applicable to this case. *See Davis*, 18 So. 3d at 847 (¶14). We therefore find no abuse of discretion in the circuit court's refusal of proposed jury instruction D-8.

¶29. Because we find no error, we affirm McKeithan's convictions and sentences.

¶30. **AFFIRMED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, FAIR, WILSON, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR.**